Curtis D. MAYS, Plaintiff,

v.

Caspar WEINBERGER, Secretary of
Health, Education and Welfare,
Defendant.

Civ. A. No. 73-C-51-L.

United States District Court,
W. D. Virginia,
Lynchburg Division.

March 6, 1974.

J. Frank Shepherd, Lynchburg, Va.,
for plaintiff.

Ronald D. Hodges, Asst. U. S. Atty.,
Roanoke, Va., for defendant.

## OPINION AND JUDGMENT

DALTON, District Judge.

This case is before the court pursuant
to § 205(g) of the Social Security Act,
42 U.S.C. § 405(g) to review a final de-
cision of the Secretary of Health, Edu-
cation and Welfare denying plaintiff's
claim for disability insurance benefits or
a period of disability under sections 223
or 216(i) of the Social Security Act.
Plaintiff first filed an application for
disability insurance benefits on May 24,
1972, alleging that he became disabled
on December 9, 1971, due to injuries to
his back, left hand and left foot. This
application was denied, and this decision
was affirmed after a hearing by an ad-
ministrative law judge in a decision dat-
ed May 1, 1973. Plaintiff's request for

review of the administrative law judge's determination was denied by the Appeals Council on July 6, 1973. This decision was the final decision of the Secretary and as such is reviewable by this court, 42 U.S.C. 405(g).

■ Plaintiff last meets the special insured status requirements of the Act on September 30, 1976, and for purposes of this review, plaintiff must establish that his disability began prior to July 6, 1973, the date the Secretary's decision became final. 42 U.S.C. § 423(b) and § 416(i)(2)(G). The only issue before this court is whether plaintiff is "disabled" within the meaning of that term in the Social Security Act. In deciding whether Mr. Mays is disabled, the function of this court is not to try the case *de novo*, but rather is to determine whether there is substantial evidence to support the administrative decision denying benefits. 42 U.S.C. § 405(g); Hicks v. Gardner, 393 F.2d 299 (4th Cir. 1968).

It is settled law that the burden of proof rests upon the plaintiff to establish his entitlement to disability benefits, Cyrus v. Celebrezze, 341 F.2d 192 (4th Cir. 1965), but the burden need not be carried beyond a reasonable doubt. Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964). To be disabled within the meaning of the Act a claimant must show "[an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 42 U.S.C. § 423(d)(1)(A).

■ Thus the establishment of a disability and the entitlement to disability benefits is a two-step process that requires first, a finding of a medically determinable physical or mental impairment which can be expected to result in death or last more than twelve months; and second, there must be a factual determination that such impairment renders a claimant unable to engage in substantial gainful activity. Laws v. Celebrezze, 368 F.2d 640, 643 (4th Cir. 1966); Thomas v. Celebrezze, *supra*, 311 F.2d at 545.

In Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962) the court enumerated four elements of proof to be considered in making a finding of a claimant's ability or disability to engage in substantial gainful activity:

(1) the objective clinical findings of treating or examining physicians divorced from expert judgments or medical opinion as to their significance;

(2) the diagnosis and expert medical opinions of the treating and examining physicians on subsidiary questions of fact;

(3) the subjective evidence of pain and disability testified to by claimant, and corroborated by his wife and his neighbors; and

(4) claimant's educational background, work history and present age.

With these standards of law in mind, the evidence before the Secretary will be considered. Mr. Mays is now thirty-seven years of age (he was born on April 5, 1936) and lives with his wife and five of his six children in a trailer park in Madison Heights, Virginia. He completed the seventh grade and has had no additional education or training. In his younger days he worked in a metal sign shop, a box factory, and as a pulp wood cutter. For approximately fourteen years prior to December 7, 1971, he worked for a roofing and sheet metal firm, progressing to the position of foreman. The record reveals that on November 18, 1970, an awning collapsed on him while he was working, fracturing his left wrist, left ankle, and nose. He was hospitalized at the Lynchburg General-Marshall Lodge Hospital for orthopedic evaluation and closed reduction of his fractures, and casts were applied. Dr. James E. Blackburn, an orthopedic surgeon, reported on Mays' treatment in a series of letters from January 29, 1971, to May 23, 1972. He noted that when he saw Mays on January 18, 1971,

there was excellent healing of his fractures of the os calcis (ankle) and of his radius on the left wrist. He was bearing weight on the left foot and was encouraged to use his wrist.

On February 15, 1971, Dr. John Risher reported that he corrected plaintiff's nose fracture by closed reduction of the fractured nasal bone and by submucous resection. There was no permanent defect or facial disfigurement noted, and no further hospitalization needed for this injury.

On March 1, 1971, x-rays by Dr. Blackburn showed excellent healing of the ankle and wrist fractures. Some therapy was recommended for relief of stiffness in the left foot and a nerve conduction test on the left wrist was also considered. Dr. Blackburn commented that corrective surgery might be necessary on the left wrist. On April 19, 1971, plaintiff returned to his job as a roofer. Dr. Blackburn reported in May, 1971, that plaintiff complained of pain in his left foot, which the doctor felt was "somewhat surprising" since the type of fracture suffered by plaintiff usually healed well. The doctor noted a great deal of stiffness in the subtalor joints and thought that Mays had a "definite disability" at the time. A leg brace and ankle support were recommended with the hope that he would improve in a few months and become asymptomatic; if there was no improvement, however, he foresaw the necessity of corrective surgery.

Plaintiff says that he wrenched his back sometime in August of 1971 after he had returned to work. Plaintiff was seen by Dr. Blackburn on September 4, 1971, who diagnosed plaintiff's injury as a lumbosacral strain, for which medications were prescribed. The doctor noted some improvement in Mays' foot discomfort and noted that he was wearing a short leg brace.

Plaintiff was admitted to the hospital on December 9, 1971, for surgery on his left foot and ankle because of continued pain and deterioration of the subtalor joint. His cast was removed on January 25, 1972, and x-rays showed early fusion of the subtalor joint, but Dr. Blackburn noted that there would be some permanent partial disability associated with the left foot and ankle. He instructed plaintiff to start walking using his leg brace without the use of crutches. By April 14, 1972, plaintiff had achieved a solid subtalor fusion which the doctor felt should have relieved all of plaintiff's discomfort, but he continued to complain of pain when he walked. Consequently, some modification of plaintiff's leg brace was made. Mays also complained of pain and numbness in his left hand. Dr. Blackburn felt that Mays would not be able to return to work as a roofer. On May 22, 1972, Dr. Blackburn again saw the plaintiff and stated that he had reached a point of recovery where an estimate of permanent disability could be made. In this regard he believed plaintiff had a 30 percent permanent partial disability of his left lower extremity and 10 percent to his left upper extremity. Dr. Blackburn was of the opinion that a median neurolysis for relief of the numbness in plaintiff's fingers might be necessary in the future.

Dr. Clarence E. Keefer, an orthopedic surgeon, saw plaintiff almost monthly between June 22, 1972 and April 5, 1973. When first seen, the plaintiff complained that he was stiff and sore in the mornings and had to exercise before being able to walk. He still had numbness in his left wrist and fingers, and had difficulty picking up things. He still wore a leg brace and said that he had difficulty walking uphill, and if he tried to stand for more than two hours, his foot would ache. Examination of the left foot showed swelling, no tenderness, but some numbness. As side to side motion had been practically eliminated by the operation, Dr. Keefer rated a 50 percent loss of use of the lower left leg. Examination of the left wrist showed no tenderness, but flexion was limited 50 percent, hyperextension 50 percent, radial motion 50 percent, ulna motion 50 percent, suppination 50 per-

cent, and pronation was limited to 50 percent. Dr. Keefer noted that the wrist gave way with lifting, and rated a 50 percent loss of use of the left arm. Examination of the back revealed no tenderness, but there were some marked muscle spasms. Hyperextension was limited 80 percent and there was discomfort on the left flank, side to side motion was limited 20 percent with some discomfort, and flexion was limited 25 percent with discomfort in the low lumbar area. Plaintiff could walk with the aid of a brace, but had a limp. X-rays showed a non-union of the styloid of the ulna; the articular surface faced posteriorly 25 degrees, while normally it would fuse anteriorly 15 degrees. An x-ray of the left foot showed an obliteration of the joint between the astragulous and os calcis. The diagnosis was synovitis of the foot, wrist and lumbar spine, arising out of the earlier fractures and back sprain suffered by Mays. It was also noted that worry over his poor recovery and inability to work had precipitated a gastro-intestinal ulcer. On July 14, 1972, Dr. Keefer noted that it took plaintiff two hours to "limber up" in the mornings. Hyperextension was limited 65 percent, side to side motion 50 percent with some discomfort, and flexion limited 75 percent with discomfort. A report on September 8, 1972, states that plaintiff had been given a cortisone injection in his left ankle which gave him some relief for about a week. Plaintiff was listed as being totally disabled. On October 6, 1972, Dr. Keefer noted that Mays had been having stomach cramps for the previous three weeks; an x-ray revealed a gastric ulcer, for which he was later scheduled to have surgery. Dr. Keefer saw plaintiff on a monthly basis until January 26, 1973, with the same basic complaints and physical findings. When Dr. Keefer last saw plaintiff on April 5, 1973, plaintiff's complaints were as before, as generally were the physical findings. Plaintiff had been under a rather extensive treatment program involving several types of medications, which after a

time he became unable to afford. As a result, Dr. Keefer discharged plaintiff with the notation that he should return when he was able to finance the medications. Dr. Keefer concluded his report with the following observations:

. . . Patient worked from 4–19–71 until 12–8–71. He had arthrodesis of his left foot and has been unable to work since then. The discomfort has increased. He is unable to do his previous work from either foot and ankle standpoint or from his back [sic]. He has passed his rehabilitation test for manual training for light work [administered by the Virginia Division of Vocational Rehabilitation at the Woodrow Wilson Training Center at Fisherville, Virginia during his evaluation there between August 24 and September 3, 1972]. This has been put off for pending gastric surgery. He is still totally disabled and will be for an indefinite future.

Dr. Jack S. Faulconer, a general practitioner, stated in a report dated April 10, 1973, that he had first seen plaintiff on March 13, 1972, when he complained of abdominal pain after eating. Plaintiff was placed on a bland diet and given medication. He was seen again in August of 1972 with pain in the epigastric area and was again given medication. In September he was x-rayed, which revealed a marked deformity of the duodenal bulb due to chronic duodenal ulcer scarring. A repeat upped GI series in December of 1972 showed a partial healing of the ulcer but with marked spasm at that time. Final diagnosis was of a chronic duodenal ulcer.

At the hearing before the administrative law judge, subjective testimony of pain and disability was received from plaintiff and corroborated by his wife and a family friend. He said that his left foot still hurts him when he stands or walks for over ten or fifteen minutes, and he has to walk with his left foot sideways. He wears a leg brace. He has numbness in his left hand, which bothers him when he tries to pick anything up; he is left-handed. His back

bothers him when he is sitting. He has nervous spasms of his stomach, he occasionally vomits blood, and is unable to eat meat without becoming nauseated. He has eaten ice cream for a month on an ulcer diet. He says his weight then was 184 pounds; earlier in 1973 it was 205 pounds. He says that his doctor recommended tests and surgery for his ulcer, but he has no money for these. Mays drives a son a total of fourteen miles a day to school. He has full motion in his fingers, and he is able to raise his arms above his head. He does exercise daily for his back, and cares for all of his personal needs, though he does no work around his trailer. He was tested in electronics, wood finishing, and a business course at the Woodrow Wilson Training Center, and he would like to take the business course, although he says they will not train him until his condition improves. Mays has been paid Workmen's Compensation benefits of $62 per week through July 1, 1972.

Plaintiff's wife of fourteen years testified that plaintiff did almost nothing around the house, but was able to care for his personal needs after he had had time to get over his morning stiffness. Mrs. Mays testified that her husband had occasional severe headaches. It was her opinion that plaintiff had not improved since his operation. Mrs. Geraldine DeMent stated that she had visited the plaintiff's home frequently for a number of years and from her personal observation, he was in pain a great deal of the time. Other than driving a car, she knew of nothing plaintiff did, and in her opinion he was unable to do any work.

In addition to the above summary of evidence, the administrative law judge called Dr. Earl Glosser, Director of Counselling at the University of Virginia, who testified as a vocational expert. Dr. Glosser testified that plaintiff had acquired skills by his work experience, such as supervisory skills, the use of precision tools, the ability to estimate amounts of material needed to perform jobs, good form perception, excellent motor coordination, a good eye, hand and foot coordination, good hand and finger dexterity, and good communication skills —all of which Dr. Glosser stated were transferable to other work. If it were assumed that plaintiff could not return to his former work as a roofer because of his lower extremity discomfort, Dr. Glosser stated that there were a number of jobs that plaintiff could do, such as an assembler in the electronics industry, styrofoam press operator, inspector, light janitorial work, sorter, plastic machine operator, and car park attendant. However, assuming that the administrative law judge gave full credence to plaintiff's alleged ulcerated stomach condition and nervousness, which would make it impossible for him to work on a regular daily schedule, Dr. Glosser thought it unreasonable to expect plaintiff to work. Dr. Glosser also thought that if Mays suffered from back pain, discomfort in his left ankle, and numbness in his hand, that it would interfere with his efficiency and normal attendance at work. Under questioning by plaintiff's attorney at the hearing, Dr. Glosser admitted that plaintiff couldn't do any really effective work if heavy credence was placed in Dr. Keefer's estimations of plaintiff's limitations of motion in his leg, wrist and back.

On the basis of the above evidence, the administrative law judge concluded that plaintiff retained the capacity to engage in substantial gainful activity, specifically the jobs mentioned by Dr. Glosser, although he concluded that plaintiff could not return to any of his former work. As has been stated previously, this court must affirm the Secretary's decision if it is supported by substantial evidence. Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion [and] consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

■ While plaintiff is admittedly relatively young and has more than a marginal education and level of intelligence, this court is of the opinion after a careful examination of the entire record that the Secretary's decision is not buttressed by substantial evidence, and that plaintiff is entitled to a period of disability and disability benefits beginning on December 9, 1971, the date he was hospitalized for surgery on his ankle. The court is of the opinion that plaintiff has met his burden of establishing that his impairments, in combination, did in fact prevent him from engaging in any substantial gainful activity for at least a twelve month continuous period beginning December 9, 1971.

The medical evidence shows that even though plaintiff was able to return to work in a supervisory capacity after his accident in November, 1970, he had to have an operation on December 9, 1971, because of continued pain and deterioration of his left foot and ankle. Dr. Blackburn, the orthopedic surgeon who had treated plaintiff on a continuous basis from the time of his initial injury, stated in May of 1971 that plaintiff would have a 30 percent partial disability of the lower left extremity and a 10 percent partial disability of the left wrist. Mays also suffered from numbness in his fingers. Dr. Keefer, another orthopedic surgeon, who apparently saw plaintiff during the period of June, 1972 through April of 1973, stated in his almost monthly reports during this period that in his opinion Mays was totally disabled. He based his opinion upon such findings as a 50 percent loss of function of the lower left extremity, a 50 percent loss of use of his left arm as a result of plaintiff's wrist giving way, and a diagnosis of synovitis of the joints in his left wrist, left foot, and lumbar spine. Significant limitations in the functionability of plaintiff's back were also noted, as were stomach cramps from a duodenal ulcer. Dr. Keefer's final report stated that Mays' discomfort had increased, rather than decreased during the period during which he was being treated.

■ While the opinion of Dr. Keefer that plaintiff was totally disabled is not determinative of the issue, since it deals with the ultimate issue to be decided after an analysis of many factors, it may premise a finding of such effect when supported by substantial evidence. Underwood v. Ribicoff, *supra*, 298 F.2d at 851. This is especially so in this instance, where Dr. Keefer treated plaintiff over a long period of time, and is therefore in a better position to adequately assess his patient's overall condition that a physician who may have seen a patient only once. Underwood v. Ribicoff, *supra*, at 853.

It appears to the court that the determinative evidence relied upon by the Secretary in support of his decision is the testimony of Dr. Glosser that Mays retained certain residual capacities—such as his ability to use precision tools, excellent motor coordination, good eye, hand and foot coordination, and good hand and finger dexterity—which were transferable to vocations other than roofing. It may be very true that Mays possesses these residual skills, but it seems ludicrous in light of the medical and subjective testimony in this case to hold that plaintiff was able to engage these skills in any substantial gainful activity during the critical period in question, from December 9, 1971 to the date that the Secretary's decision became final on July 6, 1973 (a period in excess of twelve months). Aside from Dr. Keefer's estimations of plaintiff's functional limitations in regard to use of his left arm, left leg, and back (which were substantial), the record contains notations by Dr. Keefer that plaintiff had to exercise from between one-half to two hours in the morning to be able to get about; he had numbness in his left hand and fingers (Mays is left-handed), especially when he tried to pick up something; he has to wear a brace on his left leg and cannot walk uphill; and has occasional stomach cramping. Mrs.

Mays testified that plaintiff didn't use his left hand unless he had to, he had fallen when trying to walk without his leg brace, on occasion had vomited blood and had severe headaches (which she attributed to the treatment her husband earlier received for his broken nose). Dr. Glosser conceded that it was unreasonable to expect plaintiff to work if full credence were given to plaintiff's complaints about his stomach condition, and that if plaintiff suffered from back pain, discomfort in his left ankle and numbness in his hand, it would interfere with his efficiency and work attendance. Dr. Glosser also conceded that if Dr. Keefer's evaluation of plaintiff's limitations were given full credence, he knew of no jobs which plaintiff could reasonably perform. It is clear that in assessing a claimant's condition in a case such as this, the Secretary must have considered the cumulative effect of all ailments. Hicks v. Gardner, *supra*. Considering the totality of the evidence in this case, and the demonstrated cumulative effect of plaintiff's impairments, the court is of the opinion that the Secretary's conclusion that plaintiff was able to perform the jobs enumerated by the vocational expert during the period in question is not supported by substantial evidence, and that the vocational expert's conclusion that plaintiff could not reasonably be expected to perform any job if full credence were placed in the medical and subjective testimony *is* supported by the weight of evidence.

The court necessarily limits its holding to a finding that the plaintiff has established that he has been unable by reason of medically determinable physical impairments to engage in any substantial gainful activity for a continuous period of more than twelve months. Should plaintiff regain the ability to engage in such substantial gainful activity, the Secretary may of course by the appropriate procedure, with all regard for due process, terminate payment of benefits.

Accordingly, it is the judgment of this court that the plaintiff has carried his burden of proof and is entitled to disability benefits and a period of disability. The decision of the Secretary denying plaintiff's claim for benefits is reversed, and this case is hereby remanded to the Secretary for the payment of benefits to plaintiff.

The clerk is directed to send a certified copy of this opinion and judgment to counsel of record.